UNITED STATES BANKRUPTCY COURT       FOR PUBLICATION
WESTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

In re

    KRYSTYNA WROBEL,
    aka KRYSTYNA WAWRYNCZUK,
    fdba WHITE EAGLE SQUARE          Case No. 12-13001 K
    APARTMENTS, INC., fka
    KRYSTYNA MINORCZYK

                      Debtor

-----------------------------------------------------------------


## OPINION AND ORDER


### *The § 522(o)[1] Objection to a Claim of Homestead*

### *Exemption, and Why it Was Filed*


      This is a matter of first impression in New York.  The reader is asked to

consider this hypothetical:

      "I am an unemployed middle-aged woman.  I escaped an abusive

marriage by means of a divorce proceeding that netted me $101,000, but no home.  My

---

[1] Section 522(o) of Title 11, enacted in 2005, states "For purposes of subsection (b)(3)(A), and notwithstanding subsection (a), the value of an interest in --

    (1) real or personal property that the debtor or a dependent of the debtor uses as a residence;
    (2) a cooperative that owns property that the debtor or a dependent of the debtor uses as a residence;
    (3) a burial plot for the debtor or a dependent of the debtor; or
    (4) real or personal property that the debtor or a dependent of the debtor claims as a homestead, shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.

daughter was getting married.  Her fiancee had been trying for several months to sell his one-bedroom condominium apartment through a broker at market value.  So I took $75,000 of what I got from the divorce and paid him $75,000 for the condo so that he and my daughter could get married a buy a home, and I could have a home for so long as I can afford to keep it, or until I die.

"My former matrimonial firm (not the one who achieved the settlement) sued me for more than $90,000 in fees and expenses.   It did so before I bought the condo.  Now the firm will not let me have relief in a Chapter 7 bankruptcy.  I filed for relief, but I am told that I will lose my home because of 11 U.S.C. § 522(o).  I will get my discharge, but I have to find a place to live and find a means to pay rent there.

"How could Congress have intended that result when, in 2005, it enacted § 522(o)?"

Setting aside certain irrelevant differences between this case and what is posited above[2] it is a meaningful difference that the Debtor has a part-time job and (so) is eligible for relief under Chapter 13.  If she is not allowed her homestead exemption she may withdraw the case and live with whatever the state law result might be upon such facts.  But if this were a Chapter 7 case, her former matrimonial counsel could cause a chapter 7 trustee to sell the condo, and send the Debtor off into the night, perhaps to live with her daughter and son-in-law.

---

[2] For example, the verity of the Debtor's allegation that the husband was abusive is not before this Court and will not be addressed here.  Also the market value of the unit is not in evidence.  Perhaps the Debtor paid too much for the condo.  That will be addressed below.

Consequently, this case is about how 11 U.S.C. § 522(o) affects "bankruptcy planning," but with several "twists and turns."[3]

Counsel's judgment lien was recorded a few months after the Debtor bought the condo.[4]  More than three months later she filed this Chapter 13 case.  She seeks (1) allowance of her homestead exemption, (2) avoidance (under 11 U.S.C. § 522(f)) of the judgment lien, and (3) Court approval of a Chapter 13 Plan that would pay pennies on the dollar to the firm.

Congress once was clear about such a thing.  In the legislative history to the 1978 Bankruptcy Reform Act, it stated "As under current law, the debtor will be permitted to convert non-exempt property into exempt property before filing a bankruptcy petition.  . . .  The practice is not fraudulent as to creditors, and permits the Debtor to make full use of the exemptions to which he is entitled under the law." (House Report No. 95-595 to accompany HR 8200, 95th Congress, First Session (1977) pages 360 through 363.)  That was based (in this writer's view) upon the quaint notion that the exemptions that various states provided to debtors were the basic necessities for the preservation of body, soul, and family, as well as a modicum of dignity. Appropriate exemptions also might keep people off the roll of the wards of the state.

---

[3]The Debtor denies having had a bankruptcy filing in mind at the material times, but for purposes of this decision, the Court assumes *arguendo* that the material choices made by the Debtor were in fact made in contemplation of an eventual bankruptcy petition.  Because of the holding, the possible distinction makes no difference.

[4]Because she took title before the money judgment was entered, *In re Scarpino*, 113 F.3d 338 (2nd Cir. 1997) is not implicated.  Her 11 U.S.C.  522(f) motion does not fail for any "timing" issue.

After a few notorious cases of wealthy persons relocating to states that have unlimited homestead exemptions so that they could put their wealth beyond the reach of creditors, a few other states decided to get a piece of "that action," attracting wealthy persons to their state by changing their laws to permit generous exemptions. In 2005, Congress decided that times had changed as to exemption planning in advance of a bankruptcy case.  Once the 2005 amendments were enacted, moving from one state of the nation to a more generous state would no longer  necessarily benefit a debtor who ends up seeking relief under the Bankruptcy Code.  (See 11 U.S.C. § 522(b)(3).)  A large rapid build-up of exempt equity in a homestead might not benefit  such a debtor, despite what the state homestead exemption statute might say. (See 11 U.S.C. § 522(p).)   And most importantly for purposes of today's decision, converting non-exempt property into an exempt homestead will not benefit a debtor who did so with "intent to hinder, delay or defraud a creditor."  (11 U.S.C. § 522(o), quoted above.)

The phrase "intent to hinder, delay or defraud a creditor" is also used in 11 U.S.C. § 548(a)(1)(A) permitting the setting aside of certain fraudulent transfers, and in 11 U.S.C. § 727(a)(2), dealing with denial of a discharge to a debtor who, *inter alia*, destroyed, mutilated, or concealed property with such intent.  The courts that have addressed § 522(o) have, for the most part found that the much longer-standing interpretations of that phrase within the context of §§ 548 and 727 should be applied to § 522(o) as well.  This Court disagrees in one particular respect.  This will be

addressed below.

## *Additional Facts*

For some time during the lengthy divorce proceeding the Debtor was represented by the Hogan Willig law firm ("the firm").  She did not own a homestead at the time, but rather lived in what otherwise would have been a rental unit in a multi-unit apartment building owned by her estranged husband.  (The Court does not know how many units.)  There came a time when the firm billed her for well over $100,000 (not all as to the divorce matter, but mostly so).  She filed a grievance with the State Bar,[5] fired the firm, and hired a different divorce lawyer who ultimately was able to settle the divorce proceeding upon terms by which she became the owner of the apartment building that she was living in.[6]  Hogan Willig sued her for about $80,000 in state court for fees, but also more for expenses, etc., as noted above.  When it became clear to Hogan Willig that she was about to sell the apartment building and to net a bit over $100,000 from that sale, the firm twice sought in state courts to restrain her use of those funds.  Both times those courts denied the restraint, but with no statement of reasoning that might be useful to this Court, as discussed below.

---

[5]Although her claim against the firm was her assertion that it was not properly representing her interests, the Grievance Committee found that the matter was merely a fee dispute.

[6]It has not been argued that once the matrimonial court awarded ownership to the Debtor of the building in which she was residing, she had a "homestead" in that building, and that, consequently, moving out of that building and into the condominium was simply moving one homestead to another.

In what Hogan Willig asserts is a sham transaction, the Debtor chose not to pay her $90,000 debt to it, and instead bought the condominium from her now son-in-law for $75,000 cash[7] plus a $10,500 mortgage in favor of her daughter.  About twelve months later she commenced this Chapter 13 proceeding.

Hogan Willig challenges the relief that the Debtor is seeking here on many  fronts.  This Decision will address only one of the law firm's challenges - - Its argument that 11 U.S.C. § 522(o) requires that she be denied her homestead exemption because this is a bankruptcy case, not a state law case.

Hogan Willig filed its claim in the amount of $92,377.44, secured as to the condominium by virtue of the judgment lien.  Eight other creditors filed claims.  All were unsecured claims except for the Debtor's car loan in the amount of $12,543.  The amount of the unsecured claims are $1903, $681.50, $3369, $798, $24, $1042, and $1,074.64.  Because the Debtor works part time in the housekeeping department of a local hospital, it is possible that she would not need relief under the Bankruptcy Code but for the Hogan Willig judgment.  (Her age at the outset of this case was approximately 60.  Her part-time income at the time was just under $20,000 per year.)

It is Hogan Willig's  view that the Debtor's $75,000 purchase of a homestead instead of handing that money over to it to pay her debt to it was a disposition of non-exempt cash that was "intended to hinder, delay, or defraud the firm,"

---

[7]Seventy-five thousand dollars is the maximum amount of exemption for one owner's homestead in this county.  (It varies by county per N.Y.C.P.L.R. § 5206.)

for purposes of § 522(o).  Indeed (it argues), New York Fraudulent Conveyance Law

views transfers while being sued with special condemnation.  (New York Debtor and

Creditor Law § 273-a.)  (For what it is worth, that provision of the New York statutes

does not permit the undoing of the transaction if the transferee of the non-exempt cash

gave fair consideration.  If the condominium was worth $75,000 or thereabouts, then

fair consideration was given.  However, Hogan Willig asserts that the now son-in-law

conspired with the Debtor in a scheme that to Hogan Willig is redolent of "actual intent

to defraud" the firm.  (There is a provision of New York State fraudulent conveyance

law that would permit undoing the transaction even if the transferee of the non-exempt

funds gave good consideration if a transferee was complicit in an actual intent to

defraud.  (New York Debtor and Creditor Law § 276.))

It is surprising and disappointing that there is no state law bearing on this

matter.  Matrimonial practice is heavily regulated here in New York.  If the Hogan Willig

firm had been the firm that obtained the settlement for her, it probably would have a

"charging lien" against the proceeds of the sale of the building that had been owned by

the Debtor's former spouse.  (See, for example, *In re DeWolfe*, 494 B.R. 193 (Bankr.

W.D.N.Y. 2013.))  In that event, the Debtor and the firm presumably would have

negotiated an appropriate allocation as between client and counsel even before the

settlement with the ex-husband was reached.

If, on the other hand, the Debtor had owned a home and had had equity in

it when she was represented by Hogan Willig, there may or may not have been a

means under the rules of the matrimonial courts by which the firm might obtain some lien against the real estate for the fees that were accruing.  When the firm went to state court seeking to restrain the Debtor from buying a homestead, both courts simply called the firm's fears "too speculative" to warrant a restraint.  It would have been helpful to this Court if the state courts had expressed an opinion as to whether such a choice by a former client is or is not a fraud upon the former divorce lawyer who knew every penny of her financial affairs and presumably fought to obtain a homestead for her.

The "insider" aspect is troubling.  The $75,000 is still "in the family" at least in theory, if not in fact.[8]  To lessen Hogan Willig's concern in that regard, this Court will delay the avoidance of the judgment lien for a period of time defined below. Also the Court will grant the firm 30 days in which to obtain an appraisal of the condo (if it chooses to do so) so as to make sure that the Debtor did not convey meaningful value to the daughter and son-in-law in excess of the fair market value of the unit.

### *Summary of Results*

(1) The Court will join other courts in finding that the meaning of the phrase "intent to hinder, delay, or defraud" contained in 11 U.S.C. § 522(o) is to be "informed" (at the least) by the judicial gloss on that phrase as expressed when it is used in other provisions of the Bankruptcy Code.

However, the Court will find that it is not appropriate to import all of the

---

[8]It seems that it might be tied-up as equity in her daughter and son-in-law's new home.

§ 548 and § 727 jurisprudence regarding that phrase into § 522(o).  That would yield inappropriate results.

(2) The Court will find that although the phrase is written in the disjunctive, it must be read in the whole because many things that simply "hinder" or "delay" a creditor cannot reasonably be viewed as warranting the severe consequences of loss of one's home.  The entire phrase is a term of art and must be interpreted in a sensible way.

(3) The Court will agree with courts that have utilized the many "badges of fraud" that are the product of "judicial gloss" developed over the course of decades to analyze fact patterns and transactions in relation to the governing proposition.  Here it is the phrase "intent to hinder, delay, or defraud."

(4) After examining each of the twelve "badges of fraud" argued by the firm, the Court will conclude that the firm is the wrong creditor to raise this objection.

*Findings of Fact*

Something approaching 400 pages of exhibits have been submitted to the Court, probably in somewhat equal proportion between the two sides.  Papers setting forth the state court proceedings, depositions, discovery materials, and so forth.  The Court has studied all of the submissions.

Hogan Willig has argued that 11 U.S.C. § 522(o) requires consideration

of the "badges of fraud"[9] that have been refined over many years of judicial

consideration, and have collectively been more broadly and colloquially referred to as

"The Smell Test."[10]  The Court agrees that interpretation of § 522(o) is "informed" by

the badges of fraud developed under §§ 548 and 727.[11]

The firm insists that the result in this case is commanded by focus upon

these badges (as argued by the firm, but not adjudicated by the Court).:

(1) The disposition of property (here meaning the non-exempt proceeds

from the divorce to buy the condo) was a transfer to an insider;

(2) The debtor retained possession or control of the property after the

disposition (the $75,000 is still "in the family" in theory);

(3) According to Hogan Willig, the disposition (of the $75,000) was

---

[9]See *In re Maronde*, 332 B.R. 593 (D. Minn. 2005) for the enumeration which the firm offers as the exemplar.

[10]This writer is not a fan of tests that have very many factors and no guidance as to how to weigh them relative to one another.  (What claims to be a multi-faceted proposition of law actually might be nothing more than Fletcher's "situation ethics.")  Rather than adding more factors to the "test" the Court finds that the twelve-point test meaningfully falls apart under the facts of this case, as discussed later, but only because of the unique position of Hogan Willig as the only complaining creditor.

[11]This writer does not agree that the judicial gloss upon the phrase as used in §§ 548 and 727 must be absorbed in wholesale fashion into in § 522 as a matter of statutory construction.  The three contexts are very different.  Some words and phrases have hoary meaning in one context or another.  It is incorrect to inject one meaning into a different statutory context.

At the most base level, consider "shall" and "may."  Whether in state or federal decisions, cases are legion to the effect that context permits "shall" to be read "may."  The same is true as to "void" and "voidable."  "Intent to hinder, delay or defraud" in the context of 11 U.S.C. §§ 548 and 727 involve efforts by someone to defeat the purposes of the Bankruptcy Code, and many such efforts are crimes under 18 U.S.C. §§ 152 et seq.  Often such efforts have been hidden (or sought to be hidden), or at least obscured.  By no means should a debtor's open and notorious (in this case, given Hogan Willig's zealous pursuit of the Debtor) purchase of a homestead be tested by the totality of the judicial gloss upon §§ 548 and 727.

concealed;

(4) Before the disposition was made the Debtor had been sued by Hogan

Willig;

(5) The disposition involved substantially all of the debtor's assets;

(6) The debtor absconded, *i.e.* avoided service of process and-or

concealed herself;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor (the

condominium apartment) was not reasonably equivalent to the value of the asset

transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly before or after a

substantial debt was incurred;

(10) The disposition was accomplished just prior to the filing of the

debtor's bankruptcy petition;

(11) The debtor is unable to explain the disappearance of assets; and

(12) The Debtor has engaged in a pattern of "sharp dealing" prior to the

bankruptcy.

Hogan Willig argues that eleven of the twelve badges of fraud appear

here.  It argues these matters as facts and theories.  It is argued that:

1.  The Debtor transferred the non-exempt cash to her now son-in-law

(Badge #1).  It  was substantially all of her assets, in that she received approximately

$101,000 as a result of the sale of the apartment building and she disposed of approximately $76,000 for the homestead plus tax adjustments, legal fees, etc. Moreover, she had only a nominal amount of other property. (Badge # 5.)

2.  Before the transfer was made the Debtor had been sued or threatened with suit, in that Hogan Willig's lawsuit against the Debtor had been pending for approximately six months prior to the transfer at issue.  (Badge # 4.)

3.  The transfer occurred shortly before or after the incurring of a substantial debt, to wit the judicial determination that the Debtor owed approximately $82,000 to Hogan Willig.  (Badge # 4.)

4.  The transfer was made a little more than one year before the filing of the bankruptcy case (whereas § 522(o) looks to culpable conduct even <u>ten</u> years before the filing of the petition).   (Badge #10.)

5.  The Debtor tried to evade, hinder, and delay the state court litigation process and pre-petition collection efforts by Hogan Willig; and only after her efforts were exhausted and an Order of Contempt was issued by the state court, did the Debtor file the instant Chapter 13 case.  (Badges # # 6 and 12.)

6.  The Debtor engaged in sharp dealings prior to the bankruptcy in that although she knew at the time of the transfer (the purchase of the condo from her now son-in-law) that she was going to file a bankruptcy case.  And so she led Hogan Willig "a merry chase" with promises of payment from the proceeds of the sale of the apartment building.  (Badge # 12.)

7. The transfer was concealed (Badge # 3, # 7, # 11) because in her bankruptcy schedules she did not properly reveal the amount of property received from the sale of her interest in the apartment complex, and vastly understated the obligation owed to Hogan Willig.

8.  She removed or concealed assets in that she "refused to acknowledge" her ownership interest in the apartment building and the cash settlement from the sale.  (The same as Badge #7 above.)

9.  She retained possession and control of "the property."  (The fact that Badge # 2 - - "the debtor retained control or possession of the $75,000 - - implicates at least the possibility of a nefarious scheme between the Debtor and her son-in-law and daughter.)

10.  She was insolvent or became insolvent at the time of the transfer because her liabilities outweighed her assets at the time of the transfer and after the transfer.  (Badge # 9.)

11.  "Sharp dealing" again, in another formulation.

The Debtor, on the other hand, asks the Court to apply the New York Statute requiring that exemptions be liberally construed.  See McKinney's Statutes § 291, Special Privileges and Exemptions.  The Court must, of course, deny that request because it was the stated desire of Congress in 11 U.S.C. § 522(o), *inter alia,* to limit what it perceived to be overly-generous exemptions granted by some states when and only if, a debtor seeks relief under the Bankruptcy Code and seeks full

application of the state exemption in the bankruptcy case.  Nonetheless, the Court finds

that very few of Hogan Willig's factual arguments as to badges of fraud are deserving

of acceptance by the Court when asserted by the creditor.[12]

It is true that the transfer of $75,000 in cash was to her daughter's fiancee

(the daughter's now husband[13]) and that that was a transfer of substantially all of her

non-exempt assets.  However, the fact that the Debtor did not pay Hogan Willig or help

it in collecting from her a fee that she believed it did not earn does not mean that she

"absconded" or engaged in "sharp dealings" for purposes of the numerous badges of

fraud.  Further, Hogan Willig's assertion that "the transfer . . . was concealed" makes

no sense.  The challenged transfer is the purchase of the homestead.  That was never

concealed.  Hogan Willig anticipated that purchase before the Debtor even received

the funds from the sale of the apartment building, and it twice sought in state court to

enjoin such a disposition of the proceeds that the Debtor was still to receive from the

sale of the apartment building.

Hogan Willig states:

"Although the Debtor's transfer was one of public record and noted

on the Debtor's schedules, she failed to properly reveal the amount of

property received from the sale of her interest in her corporation prior to

---

[12]The Court expresses no opinion about what the result might be if any of the other unsecured creditors were to raise the same objections.

[13]Again, this is not a ruling that a daughter's fiancee is an "insider" for purposes of 11 U.S.C. 101(31).

filing.  The Debtor's schedules, at best, are misleading with respect to

transfer [sic] and the income received prior to the filing, as well as the

Debtor's vastly understated the [sic] obligation owed to [Hogan Willig] in

an effort to minimize the obligation."

Clearly the transfer that is challenged here is the Debtor's conversion of

non-exempt cash into an exempt homestead, and not the sale of the apartment

building.  Going a bit further in the wrong direction, Hogan Willig states that the Debtor

"removed or concealed assets" because, "the Debtor, through her testimony, and sworn

affidavits, refused to acknowledge her ownership interest in an asset which yielded her

a great deal of income and revenue prior to the bankruptcy filing.  The Debtor failed to

acknowledge the receipts [sic] of thousands of dollars in rents and receipt of a large

cash settlement of approximately $101,000."

This argument borders on sanctionable conduct.  The Debtor's interest in

the apartment building was revealed from the outset of this Chapter 13 case as a

"former d/b/a" in the caption of her petition.  Hogan Willig is of the view that her

schedules were not as thorough as they should have been as to the income from  the

apartment business, but Hogan Willig knows, more than any other creditor, that the

apartment business was not the Debtor's business.  It was her husband's business.

The Court rejects any and every Hogan Willig submission that is premised upon its

view that  the Debtor's former husband's ownership of "White Eagle Square

Apartments, Inc." should have been reported <u>as the **Debtor's** ownership</u>.[14]

As to the condominium, the badge of fraud that states "The Debtor retained possession or control of the property after the transfer" is of some concern here, and will be addressed at the conclusion of this Decision. This involves the "insider" aspect of the matter at hand.

A badge argued by Hogan Willig is that the Debtor was insolvent or became insolvent as a consequence or at the time of the acquisition of the homestead. Hogan Willig's argument begs the question. Clearly, exchanging $75,000 in non-exempt cash for $75,000 equity in an exempt homestead does not deplete a Debtor's assets. (Indeed, it can make those assets grow.) Cases are legion addressing whether a Debtor is <u>statutorily</u> "insolvent" if exempt property is to be included on the asset side. Those cases are not useful here. Hogan Willig's real complaint is that "cash" was put beyond its reach - - not that Debtor became "insolvent." All of the "badges of fraud" and "tests of insolvency" lead to the same question - - does the Debtor lose her <u>homestead exemption</u> because she openly and notoriously acquired

---

[14]The Court categorically rejects the notion argued by Hogan Willig that the Debtor had some sort of ownership interest or equitable interest in White Eagle Square Apts., Inc. before an interest in an asset of that corporation was awarded to her by the matrimonial court. It is <u>more than disappointing</u> that Hogan Willig makes such an argument. Even if it might not be unethical, <u>it knows matrimonial law</u>. It <u>knows</u> that matrimonial courts in New York interpret and apply "<u>equitable distribution</u>." As this Court understands it, there can be no ownership by one spouse in the other spouse's separate property until the matrimonial court makes a final award, reduced to judgment. The firm's argument, seemingly based in some sense of legal reality, is just frustration, and, possibly, punishment of its former client.

As noted above, it verges on sanctionable conduct for Hogan Willig to argue that an eventual award of ownership in her husband's property should be treated as if she had actual ownership of her husband's business because they were married and because she eventually earned a distributive award of a building. Hogan Willig is warned that it must not burden this federal court with any state law claim so devoid of merit.

the homestead with non-exempt cash while being sued by Hogan Willig and after the state courts denied relief to the firm?

The Court recognizes and adopts the reasoning of the cases that have found  that proving that the conversion of non-exempt property into an exempt homestead "without proving _something more_" does not sustain the burden of proof imposed upon one objecting to the Debtor's claim of a homestead exemption under § 522(o).  (See, for example _In re Addison_, 540 F.3d 805 (8th Cir. 2008).)   From one perspective, the "more" that the principle requires might seem to be satisfied by the fact that the Debtor knew that she was being sued for a very significant dollar amount.  On the other hand, the suit here was by a creditor which, unlike a credit card company (for example), was no stranger to her, knew her financial affairs and intentions, and unsuccessfully sought to block her intentions.  It was her former divorce firm.  She hid nothing from anyone, Hogan Willig least of all.  The firm's effort to argue that it should be treated as, or represents, some other unsecured creditor of the Debtor - - a creditor who actually might argue surprise and deception - - is rejected.  In other words, the badges of fraud bespeak "hiding," "absconding," "avoiding," "sharp dealing," etc.  The natural question is "Who exactly is it who was victimized by such evil actions?"  Certainly not Hogan Willig, and no one else is complaining.

_Conclusion._

At the beginning of this Decision the Court explained "why" the § 522(o)

objection was filed by Hogan Willig.  The Court finds that its Decision rests upon "who"

is raising the objection, and for whose benefit is it raised.  It is a narrow holding.[15]

When the creditor raising 11 U.S.C. § 522(o) asserts the existence of its

own lawsuit against the Debtor as the "<u>something more</u>" that is necessary to establish

the "intent to hinder, delay, or defraud," it is appropriate (in this Court's view) to

consider circumstances that negate that creditor's claim of outrage and  victimization,

at least where no other creditor complains of any unfair loss by reason of the Chapter

13 filing and Plan.

As explained above, the phrase "hinder, delay or defraud" is a statutory

whole, not to be parsed and severed to a point of absurdity.  If I owe you a judgment

debt for $20,000 and receive a non-exempt $1000 tax refund, and spend it for food and

shelter, there can be no doubt that I have hindered or delayed you, but my choice

certainly was not a fraud worked upon you.  The same might be true if I used the $1000

to put a roof over my head for four months at $250/month in rent.

Ratchet the hypothetical up tenfold - - a $10,000 non-exempt windfall

(e.g. inheritance, gift, bonus).  I owe you $20,000.  I prepay my $1000/month rent for 10

months.  Still it might be hard to see any fraud there.  But spending the $10,000 on a

daughter's wedding?  That certainly moves the needle on the "smell test" indicator, and

the bankruptcy courts have addressed <u>that</u> issue for decades in a different context - -

---

[15]Debtors must be warned that once he or she files for Chapter 7 relief, it might be too late to save
the home if a 522(o) objection is sustained.

<u>borrowing</u> $10,000 (or some other amount) to pay for this or that while insolvent or

facing insolvency. Section 523(a)(2)(A) cases include a subset of cases in which a

credit card is run up in contemplation of bankruptcy. It is typical that such a debt will be

excepted from discharge, upon proper process and satisfaction of the burden of proof.

   Sometimes the differences between those cases and this case are (1) the

fact that § 523(a)(2)(A) cases usually involve <u>someone else's</u> money, not the debtor's,

and (2) in many such cases, whatever the debtor received is gone - - rent, a vacation, a

family event, doctor bills, car repairs, tuition, etc. Here the Debtor used <u>her own</u>

identifiable  non-exempt money to put a roof over her head for as long as she wishes to

live there (and can pay the taxes, etc.), but she knew that she owed money to the firm.

The value is not gone like a fancy vacation.[16]  Clearly, bankruptcy might have been

contemplated as a possible "end game" and as this Court stated at the outset, the

Court has presumed so for purposes of this Decision. That said, not every use of a

bankruptcy filing represents fraud. Phrased another way, "bankruptcy planning" is not,

of itself, "fraud," even after the 2005 amendments. Debtor's counsel has correctly

characterized the position of Hogan Willig in this case as being that of one who

complains that the **Debtor "did not hold non-exempt property securely in a fashion**

**to facilitate collection by Hogan Willig."**

--------

[16]Ratchet the hypothetical back and consider a $20,000 non-exempt windfall spent on a dream vacation rather than paying Hogan Willig. The firm would complain of fraud and/or "willful and malicious injury" under § 523 and it would lose because the money at issue here was clearly and unequivocally the Debtor's own money - - not borrowed, not liened by the firm, etc.

For all of the reasons stated above, the Court is prepared to reject Hogan

Willig's objection to the Court allowing a homestead exemption to the Debtor in the

amount of $75,000.  (Others of the firm's § 522(o) arguments to the contrary have been

considered by the Court and are rejected.)   However, the Court sees something

significant in the fact that the Debtor bought her condo from her now son-in-law.  The

badges of fraud that address transfers to an insider while maintaining control over the

transferred property, work in tandem to bespeak the "parking" of the asset; sheltering it

under the ownership of the insider, but controlling it so that the Debtor later may

surreptitiously enjoy the value whether that property is later  reconveyed to the Debtor

or not.  Here, the record suggests that the now son-in-law had his condominium on the

market for several months through a broker, without success because it is only a one-

bedroom condominium.   It is also possible that the unit is worth far less than what she

paid for it.

To lessen the firm's concerns in these regards, the Court will delay the

entry of an order setting the judgment lien aside until 1215 days from the date of the

acquisition of the condominium or until three years from the date of this Decision,

whichever is later, and then will require a demonstration that the condominium is still

her homestead and that none of the purchase price has been returned to her in any

way or form.[17]

---

[17]In 11 U.S.C. § 522(p) Congress chose "1215 days" for a meaningful purpose, although this Court cannot discern that choice of that number.  To the extent that a debtor improves his or her equity in certain exempt property beyond a statutorily-adjusted dollar amount (currently $ 155,675) during the 1215 days

Further, although the record does not contain any reflection of a contest as to the value of the condominium unit, the firm will have 30 days for an appraisal if it wishes one.

Other things remain challenged by Hogan Willig and are not resolved by this decision. (For example, it challenges the "good faith" of this filing and Plan given a fact like the fact that the Debtor scheduled her debt to the firm at less than $10,000 despite the $92,000 judgment.)

This and all other pending matters in this case are restored to the Chapter 13 calendar on May 12, 2014, at 12:00 p.m. If there is no dispute that the condominium is worth something near $86,500, then (1) the firm's claim will be allowed as an unsecured claim only,[18] (2) avoidance of the firm's judgment lien will be denied without prejudice to a new motion to be made after the later of 1215 days after the acquisition of the condo and three years from the d ate of this Decision.

The Court disclaims any view as to the Hogan Willig challenges that have yet to be addressed by the Court. Those have been read, but by no means reflected-upon by this writer. The fact that objections remain to be addressed in this case cause

_____

preceding the petition date, the exemption will not be allowed. In other words, an "intent to hinder, delay or defraud" looks back ten years. Building-up equity looks back only 1215 days, and forgives the first $ 155,675 of the build-up. Certainly § 522(p) has no applicability here, nor is there any analogy. However, given that Congress thought 1215 days to be less arbitrary than some other time period, the Court adopts it.

[18]Allowance as an unsecured claim does not affect the judgment lien in this case. That will remain in place pending further order of the Court. Consequently, dismissal of this case will restore the status quo ante. Also the Plan cannot be confirmed at that time in any event (other than settlement) because of Hogan Willig's other objections to this Debtor's filing and her proposed Plan.

the Court to ask the parties to discuss what would happen if eventually the Debtor's

case must be dismissed for lack of a confirmable Plan.

Will the firm go back to state court seeking to foreclose its judgment lien

despite the homestead exemption, arguing, "We asked you to restrain her and you

denied the restraint because you thought our fears to be 'too speculative.'"  That is

probably a difficult proposition to argue under state law.  If the Debtor had taken an

"Around the World" trip with National Geographic Expeditions for $75,000 the money

would be gone.  The fact that it is now equity in the condo unit is a good thing, but it is

hard to see how a state court wold give the benefit of that fact to Hogan Willig rather

than to Ms. Wrobel.

Will there instead be a peaceful co-existence?  The judgment lien could

sit in place for years to come, with some satisfaction of it some day.

The parties are encouraged to discuss such things toward the possibility

of a settlement.

SO ORDERED.

Dated:          Buffalo, New York
                    March 28, 2014


                                                            s/Michael J. Kaplan
                                                  _____
                                                            U.S.B.J.