UNITED STATES BANKRUPTCY COURT          FOR PUBLICATION
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------
In re

    KRYSTYNA WROBEL,
    aka KRYSTYNA WAWRYNCZUK,
    fdba WHITE EAGLE SQUARE              Case No. 12-13001 K
    APARTMENTS, INC., fka
    KRYSTYNA MINORCZYK

                    Debtor
------------------------------------------------------------------


APPEALABLE DECISION AND ORDER

     This Chapter 13 case is a two-party dispute - - the Debtor cannot pay her

former matrimonial lawyer's $88,000 fee because she bought a $75,000 condominium

that is her homestead instead of paying the lawyer, and the money that paid for the

home derived at least in part from the lawyer's work on her behalf.

     In an earlier interlocutory ruling[1] regarding 11 U.S.C. § 522(o)[2] the Court

---

[1] *In re Wrobel*, 508 B.R. 271. The present Decision presumes familiarity with that ruling.

[2] The statute reads as follows:

    (o) For purposes of subsection (b)(3)(A), and notwithstanding subsection (a), the
value of an interest in –
        (1) real or personal property that the debtor or a dependent of the
debtor uses as a residence;
        (2) a cooperative that owns property that the debtor or a dependent
of the debtor uses as a residence;
        (3) a burial plot for the debtor or a dependent of the debtor; or
        (4) real or personal property that the debtor or a dependent of the
debtor claims as a homestead,
shall be reduced to the extent that such value is attributable to any portion
of any property that the debtor disposed of in the 10-year period ending on
the date of the filing of the petition with the intent to hinder, delay, or
defraud a creditor and that the debtor could not exempt, or that portion that
the debtor could not attempt, under subsection (b), if on such date the
debtor had held the property so disposed of.

pointed out that the Legislative History to the 1978 Bankruptcy Reform Act approved the pre-petition conversion of non-exempt property into exempt property as part of "bankruptcy planning." Congress legislated otherwise in 2005.  The enactment known as BAPCPA included § 522(o).  In that earlier ruling the Court found that § 522(o) could not be asserted against the Debtor by her former divorce counsel, the Hogan Willig law firm.  (Hereinafter referred to in this Decision as "the Firm.")[3]  The Court then moved on to the Firm's 11 U.S.C. § 1325(a)(3) and (7) objections to the Debtor's Amended Plan. (The Debtor's original plan had been to pay 5% of the Firm's judgment claim of over $88,000 but the Debtor amended that to 10% at the beginning of the hearing on the Firm's objection to confirmation for lack of "good faith.")  In the midst of the multi-day hearing, with the parties embroiled in a dispute over the Firm's effort to employ the "crime/fraud" exception to the attorney-client privilege, the Court issued a decision (525 B.R. 211 Bankr. W.D.N.Y. 2015) upholding the Firm's objection to the Debtor's 10% plan as lacking "good faith," but giving the Debtor a period of time in which to propose a further amended plan if she so desired.

        She then amended her plan to provide for 27% payment to Hogan Willig, calling upon the good graces of her adult children to assist her as might be necessary. (She is a part-time hourly worker in the housekeeping department of a local hospital, and is approximately sixty years of age.)  Hogan Willig objected to that plan too on "good faith" grounds and made a proposal for a plan which, if the Debtor would have

_____

[3]The Firm sought leave to appeal the interlocutory decision, but the District Court denied such leave.

adopted the proposal, would have been supported by Hogan Willig.  The proposal (in

broad strokes) was that Hogan Willig would forego any payments at all for 5 years in

order to enable the Debtor to obtain financial stability, and at the end of that period the

Debtor would either borrow against her homestead condominium or sell it and pay the

Firm $75,000 dollars.  That promise would be secured by a lien on the home.  The

Debtor did not accept that proposal, and so the Court reopened the hearing on "good

faith" which now focused on a 27% plan rather than a 10% plan.

On May 4 and 5, 2015, the Court heard the § 1325(a)(3) and (a)(7)

objections to the Chapter 13 filing itself and to the 27% plan.  Just prior to the hearing

the Court informed the parties that the Court would uphold the attorney-client privilege;

the Firm should not prepare for that hearing with a different expectation.[4]  Three

witnesses were called: Corey Hogan, Attorney, a principal in the Firm; Amanda Kelly,

Attorney, who first was a law clerk at the Firm and later became an attorney there, and

who was a contact point for the Debtor while the Firm represented the Debtor; and the

third witness called was the Debtor.

The Court stated at the beginning of the hearing that the case of

*Kellernan v. Andrijevic,* 825 F.2d 692 (2nd Cir. 1987), was binding on this Court and,

thus, this Court would not "look behind" the judgment obtained in a state court, and so

there was no need for the Hogan Willig firm to defend its representation of the Debtor

in her matrimonial proceeding.  However, much of the Debtor's advocacy as to her

---

[4]That ruling will be explained at the end of this Decision and Order.

"good faith" in the Chapter 13 filing, and in the Plan process, was based on her

allegations that the Firm did not deliver on its promises in the matrimonial case,

overcharged her, and (as she stated in a grievance petition filed with the Grievance

Committee of the County Bar Association) the Firm "did not have [her] best interest in

mind."  Consequently, this Court ruled that testimony from Attorney Hogan and from

Attorney Kelly in defense of their work for the Debtor was relevant to the Debtor's

proffer of "good faith," and (in any event) should be permitted to be placed on the

record in light of the Debtor's disparagement of the Firm.  Also, the fact that English is a

second language for the Debtor was placed at issue by the Debtor and her current

counsel in response to certain of the Firm's allegations of false or inconsistent

statements to the Court by the Debtor in the schedules and statements filed with the

Court, or in testimony at the § 341 meeting and 2004 examination.  Consequently,

testimony from Attorney Hogan and Attorney Kelly regarding their verbal or written

communications with the Debtor while they represented her were ruled to be relevant

and admissible.

DISCUSSION

First, the Court finds that to the extent that the Court implied in its earlier

decisions in this case that the Hogan Willig firm was less than attentive to, and faithful

to, its obligations to the Debtor in the matrimonial proceeding, such an implication was

unfair, in part. The phrase "in part" is used because the Firm did not offer evidence to

contradict the Debtor's account until now, three years into this case.  After many

attacks by the Debtor upon Hogan Willig's quality of representation, only now has the

Firm responded robustly.[5]  The testimony of Mr. Hogan and Ms. Kelly satisfies the

Court that if the Second Circuit Decision case in *Kellernan* did not exist (such that this

Court could assess whether the fee was fully earned in the judgment amount of

$88,850), the Court would indeed find that the fee was earned.  The 800 hours that the

Firm spent on the divorce only (not the personal injury case (which was contingent fee)

and not the traffic ticket (less than two hours to get it reduced to a non-moving

violation)) seems to be a reasonable amount of time.  In the Court's view, it was the

original agreed hourly rate that caused the enormous bill (over $120,000) to the Debtor

that caused her to run immediately to the Grievance Committee because she had

nothing to offer in payment and because (in her opinion) the reason that she had

nothing to offer was because of the failure of the Hogan Willig firm to deliver on its

promises.  For example, it is her testimony that the Hogan Willig firm promised support

payments from her husband within six months after its retention by her, but no support

payments ever came.[6]

       Because this writer has not been engaged in the practice of law since he

became a federal employee in 1981, he cannot say whether this Debtor ever should

---

[5]In a relatively recent hearing in this 34 month-old Chapter 13 case, the named partner who was the lead attorney for the Debtor in the matrimonial case admitted that "maybe" he didn't pay enough attention to what was (or was not) being asserted by the Firm in this Court.

[6]She did eventually receive an income stream from rents, but her testimony is that she used them to maintain the rental units (one of which was her residence), not to meet her own other needs.

have gotten such a huge bill from her matrimonial firm; perhaps billing-judgment should

have "kicked-in" before such a bill was sent to a client who had no money to pay.

Eventually the Firm reduced the rate to $100/hr., and the bill to $80,000, but only in its

lawsuit against the Debtor.  The $120,000 bill incited the Debtor to file a grievance, and

the resulting mutual animus has driven this case (at the expense of all of us Federal

taxpayers) since the day this case was filed almost three years ago.


Analysis

Although the June 1, 2015 submission by the Hogan Willig firm was

invited only as to the question of "burden of proof," the Firm enlarged it into a broader

closing argument.  The Court agrees that the burden of proof is on the Debtor.  (The

Debtor has not argued otherwise.)  It is the Court's view, however, drawing all

inferences of fact in favor of Hogan Willig, that this 27% plan is a "good faith" plan even

though the Debtor does not offer any accommodation in the form of a continuing lien on

her homestead.[7]  The Court questions the wisdom of the Debtor's decision to reject

Hogan Willig's proposal out-of-hand.  Today's ruling surely will lead to an appeal by the

Firm, while a negotiated solution would lay everything to rest.[8]

---

[7]Again, in *In re Wrobel*, 508 B.R. 271, this Court set the Firm's judgment lien aside under 11 U.S.C. § 522(f), but not without conditions.

[8]In its February 12, 2015 Decision upholding the Firm's objection to the 10% Plan, the Court discussed "sacrifices" commonly made by Chapter 13 debtors to prove a plan "feasible" (such as getting a part-time second job, putting the kids in public school rather than private school, surrendering a vehicle that commands high debt-service, and even putting the "McMansion" on the market) and the fact that some types of "sacrifices" might be necessary in some cases to prove that a Chapter 13 plan is a "good faith" plan.  In

But the wisdom of the Debtor's choice is not what is before the Court. Rather the question is whether the 27% proposal is "fundamentally fair" as to the Firm, and the Court finds that it is both fundamentally fair, and is equitable. (11 U.S.C. § 1325(a) (3) ). The Court begins with the Hogan Willig law firm's submission of June 1, 2015. As stated above, it is more of a summation than it is a brief on the question of "burden of proof." It re-examines all of its previous submissions and arguments through the lens of whether the Debtor has sustained her burden of proof. There being no opposition to the Court considering it all, and given the result announced now (in favor of the Debtor) the Court will address the entire submission.

It asserts that a "totality of circumstances test" should be adopted by this Court in deciding whether this is a good faith" filing" and a good faith "plan."[9] The Court agrees, but notes that a "totality" test that includes eleven factors but offers little guidance as to the relevant weight of any one factor as opposed to another is almost impossible to apply. That is why this writer has often said that "totality of circumstances" tests often are nothing more than "situation ethics" rather than "rule of law." For example, see *Wrobel*, 508 B.R. 271 at 277 as to the "twelve badges of fraud"

---

the 27% Plan before the Court, the "sacrifice" is the supposed promises of the Debtor's adult children to help her to meet the Plan payments. (The Court is not worried about whether they will in fact so help – dismissal of this case for failure to make adequate Plan payments would invoke a risk, because under 11 U.S.C. § 349, the Firm's judgment lien on the homestead would exist with full force. What is an 11 U.S.C. § 522(o) matter in this Court, would become a N.Y. C.P.L.R. 5206 matter in a judgment lien foreclosure case in state court. Would the state courts permit foreclosure upon a <u>judgment</u> lien as to a <u>homestead</u> under the facts of this case, <u>despite</u> § 5206's protection of up to $75,000 in homestead equity?)

[9]*In re Corino*, 191 B.R. 293 (Bankr. N.D.N.Y 1995).

Main Document      Page 7 of 22

argued by the Firm in the 11 U.S.C. § 522(o) context.

It is to the Firm's credit that it quotes as to the "good faith" test the entire relevant passage from the *Corino* decision.[10]  What it chooses to put in bold face, rather than in normal face, is informative.  The following is a quote from page 4 of the Firm's "Brief on Burden of Proof."  The emphasis is the Firm's.

"Courts in this circuit have thus enumerated a non-exhaustive list of factors to be considered in this 'totality of the circumstances' approach:

"The good faith analysis includes consideration of the so-*called Estus* factors: (1) the amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn, and likelihood of future increase in income; (3) the duration of the plan; (4)  **the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment of creditors; (6) the extent to which secured claims are modified;** (7) the type of debt sought to be discharged, and whether any such debt is potentially non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under

---

[10]Id.

the Code; (10) **the motivation and sincerity of the debtor in seeking**

**Chapter 13 relief** and (11) the burden which the plan's administration

would place upon the Chapter 13 trustee.

"*In re Corino*, 191 B.R. 283, 289 (Bankr. N.D.N.Y. 1995) (emphasis

added)."

In other words, out of eleven factors in the "totality of the circumstances"

test of "good faith", the Firm takes issue with the Debtor and her plan only as to four

factors; 4, 5, 6, and 10.  It is as if the Firm believes that in such a "totality of the

circumstances" test, the Debtor must <u>not run afoul</u> of <u>any one</u> of the factors.  That is not

the Court's understanding of the meaning of the phrase "totality of the circumstances."

Rather, having applied such multi-factor "totality of the circumstances" tests under

various provisions of the Bankruptcy Code for well over two decades, this writer is of

the view that seven out of eleven is pretty good, even if the Court were to agree that

the Debtor got four of the factors wrong.  (And the Court does <u>not</u> so agree as will be

explained below.)

The Firm cites other cases regarding the "good faith test" and this writer

agrees that the holdings of those cases do indeed recite the correct standard for a

finding of "good faith."   *In re Taylor*, 243 B.R. 226, 229 (Bankr. W.D.N.Y 2000) (an

absence of good faith may lay in "seeking to extract too many benefits" from the

Chapter 13 process at a creditor's expense); *In re Bodine*, 113 B.R. 134, 136 (Bankr.

W.D.N.Y. 1990) ("good faith" requires a determination by the Court that a debtor has

not misrepresented facts in his or her plan, unfairly manipulated the Bankruptcy Code or otherwise ............ in an inequitable manner); and *In re Mattson*, 241 B.R. 629, 637 (Bankr. MN 1999)  ("the bottom line for most courts . . . . is whether the debtor is attempting to thwart . . .  creditors or is making an honest attempt to repay them.")

This writer has ruled many times from the bench, or in writing, that "good faith" simply means "fundamental fairness."  Obviously, that means the "totality of the circumstances," whether accompanied with a list of factors or not.  "Good faith" boils down to what the court has seen as effort by a Chapter 13 debtor to meet that standard.[11]  In part it is a matter of process, such as offering to negotiate a Chapter 13 plan with the creditor or creditors.  Partly it is substance, such as a willingness to make sacrifices in order to offer a fair result.

This Court is of the belief that this 27% Plan passes § 1325 muster.  This case ultimately will turn upon whether its interlocutory ruling in the Debtor's favor with regard to the 11 U.S.C. § 522(o) question (which ruling granted the Debtor's § 522(f) motion to set aside the law Firm's judgment lien against her homestead) was correct or not.  Before the Court turns to findings of fact and conclusions of law, it adds that if it had known when it filed its decision regarding the § 522(o) issue, that this case could not be settled while that decision remained without judicial review, this Court would have made a Rule 54(b) certification that there is "no just cause for delay" so that the

---

[11]Here at the trial level, invocation of Justice Stewart's "test" is intended only to bear upon the "clearly erroneous" standard, when there comes judicial review.

District Court might have granted the review back in March of 2014.


Rule 52 Findings of Fact and Conclusions of Law

First comes Hogan Willig's argument that various mistakes found in the

Debtor's Schedules and Statements, when viewed in light of the totality of

circumstances, "demonstrate that the Debtor was attempting to mislead the Court or

cast herself in an inaccurate light", even though such mistakes may be common and

ordinarily would not demonstrate bad faith, of themselves.

The Court finds otherwise. In the totality of the circumstances in this

case, the Court does not discern any effort on the part of the Debtor to attempt to

mislead the Court or to cast herself in an inaccurate light by means of what she did or

did not disclose in her Schedules and Statements. The Firm argues that she failed

properly to schedule her interest in, and income from, White Eagle Apartments, which

had been her ex-husband's business. White Eagle should have been mentioned in

certain other places in the Schedules and Statements, but the Court finds it satisfactory

that the caption that she placed on her Chapter 13 Petition upon its initial filing included

the notation that she was "f/d/b" (formerly doing business) as "White Eagle Square

Apartments, Inc." Many debtors who have been engaged in business wisely do the

same thing in some form or another. They, and the Court, want creditors to associate

their name with the name of the business enterprise, and they want there to be no

doubt in the minds of a Trustee or party-in-interest that they have an association of

whatever sort with a debtor or non-debtor business enterprise.  At the § 341 meeting,

the trustee (in a Chapter 7, 12 or 13 case) or the U.S. Trustee or Creditor's Committee

(in a Chapter 11 case) always elicits testimony regarding whether the business entity is

a *de jure* separate entity, or a d/b/a, etc., and may or may not insist that amended

Schedules and Statements be filed to reflect such things as stock ownership in a

corporation under the personal property schedule (Schedule B), self-employment in the

income schedule (Schedule I), etc., or other amendments that will properly reflect the

nature of the business enterprise and the debtor's relationship  thereto.  Unlike most

districts (if not all other districts), this Court requires all Chapter 13 cases to be

presented in open court with the debtor sworn and on the stand, even if no one has

filed an objection to confirmation (with very rare exceptions.[12])  At the confirmation

hearing, the Court wants to know what the relationship is or was between the debtor or

debtors and the business entity noted in the caption of the Petition.  The Chapter 13

---

[12]The typical exceptions are:  where one joint debtor cannot attend the confirmation hearing, but has appeared before the Chapter 13 Trustee before, and the other co-debtor spouse is on the witness stand before the Court; where a debtor has appeared before the Trustee at the 341 meeting and is physically challenged by coming to Court; where the debtor is known to the Court, perhaps an attorney who regularly appears before the Court, and (consequently) the Court is not concerned about his or her understanding of the relevant law and the provisions of his or her Chapter 13 Plan; or where the presiding judge has been called away from Court in an emergency, and another judge of this Court is not available to conduct the confirmation hearing.

Most (if not all) other courts have done away with confirmation hearings in the absence of an objection to confirmation.  This writer has full respect and regard for that interpretation of the applicable Rules, especially in courts that are overwhelmed by work.  In 1977, this two-judge bankruptcy court became a three-judge bankruptcy court and has managed its workload (though stressed at times) without abandoning the process of making sure "that a Chapter 13 debtor speaks (under oath) with someone in a black robe" to impress upon the Chapter 13 debtor that his or her case is a federal judicial proceeding, not to be taken lightly, and hopefully not to be repeated.  (The quote and the process comes from my predecessors, and my past and present colleagues, on this Bench.)

Trustee reports on that matter to the Court, and sometimes will not recommend

confirmation because a debtor's explanation is unsatisfactory to the Trustee.

Sometimes the resulting colloquy with a debtor's attorney results in the debtor

withdrawing his or her Chapter 13 case, or results in an amended Chapter 13 Plan that

improves the payment to creditors, or results in amended schedules that resolve the

matter to the satisfaction of the Chapter 13 Trustee and the Court, or results in the

Court or the Trustee referring the matter to the United States Attorney for possible

criminal implication.

      In light of this Court's Chapter 13 practice, which is well-known to this

Debtor's attorney, but perhaps not so well-known to the Firm, the Court finds that there

was no intention to mislead the Court as to the fact that she had an interest in White

Eagle Square Apartments, Inc.  Whether it was properly scheduled elsewhere or not,

she placed it in the caption of her Petition, and the Chapter 13 Trustee has

recommended confirmation of her 27% Plan.[13]

      The Court has considered the Firm's other arguments regarding the

accuracy or completeness of the Debtor's schedules and statements and rejects them

because of what this writer thinks of as the "filter-and-correct" mechanisms reflected

above, and what appears to have been careful efforts by the Debtor and her counsel to

disclose everything that the mechanism implicates.  They have complied fully.

---

[13]See *In re LaSota*, 351 B.R. 56 (Bankr. W.D.N.Y. 2006) as to the role of the Chapter 13 Trustee in this District.

Before <u>this</u> Court, all ambiguities and uncertainties in a Chapter 13 case,

and all inconsistencies are heard by the Court at a confirmation hearing that is

conducted in open court and recorded verbatim.  An issue might slip through here or

there in the generality of cases, but not in this case.  Perhaps the Firm's research as to

"good faith" involved cases from districts in which the Chapter 13 Trustees are less

attentive, or are more demanding, than in this District,[14] or where the court does not

conduct confirmation hearings in the absence of objection.  Those decisions are not

applicable here.

Next comes the Firm's argument that the Debtor

"intentionally used the proceeds from the sale of White Eagle

Square Apartments to purchase the Chestnut Ridge condominium from

her son-in-law, thereby also giving a mortgage to her daughter despite

the fact that her daughter did not own the property conveyed to Debtor.

In doing so, Debtor unfairly and preferentially chose to transfer her money

to her family members, instead of using it to pay off her debt to Hogan

Willig."

Also the Firm argues that the Debtor endeavored to satisfy her obligations

to the lawyer who succeeded the Firm in the matrimonial proceeding.  She is alleged to

---

[14]A less-attentive Chapter 13 Trustee might let questionable cases skate through, causing harm to creditors.  A more demanding Chapter 13 Trustee might have insisted (in a case like this) that every item or question in every Schedule and Statement be answered precisely in <u>Amended</u> Schedules and Statements, causing harm to <u>debtors</u>, who have to pay more for legal representation than otherwise would be necessary.

have do so by borrowing from a credit union to pay that lawyer's bill and then using part of the proceeds from the sale of White Eagle to pay off the credit union.

The Court has previously ruled that this is a two-party dispute.  Thus, the Court has no difficulty in agreeing with the Firm that this Petition was filed solely to deal with the debt to Hogan Willig.  But the Court rules that filing a Chapter 13 case to deal with one very large debt is not a "bad faith" filing so long as the Chapter 13 Plan treats that creditor in a "fundamentally fair" manner, and the Court has considered the Debtor's choices that left the Firm "in the cold."  When the Court previously ruled that the Debtor's 5% proposal to Hogan Willig and her 10% proposal to Hogan Willig were not "fundamentally fair;" it pointedly called for some degree of sacrifice by the Debtor, to favor the Firm.  The proposal by the Firm was a good-faith "negotiation."  The Debtor countered by nearly tripling her offer to the Firm with "sacrifice" by virtue of her adult children's commitment to help her.[15]  The Court finds that this 27% proposal does not suffer the infirmities of the lesser Plans.[16]

_____

[15]When this writer spoke of "sacrifice" in its earlier ruling, it had in mind the possibility of a continuing judgment lien for the Firm (in some negotiated amount) that could not be foreclosed until the sale of the condominium, or the Debtor ceasing to live there.  It was not the Court's intention to cause the Debtor's children to make any sacrifice.  That said, the only reason that the Court is willing to confirm this Plan without binding documents or testimony from the children is the fact that the Firm's judgment lien will encumber the home if the case is eventually dismissed for failure to make payments.

[16]The Firm has correctly pointed out to the Court that the mathematics of the Debtor's current plan would yield $23,989.56 of the $88,850.22 judgment amount, but does not address post-judgment interest of over $24,000.  If the Court's ruling under § 522(o) is correct and is upheld upon the inevitable appeal of the present Decision, post-judgment interest will have run on the Firm's judgment only until the petition in this case was filed back in 2012.  Presuming that the Order setting aside the judgment lien on the Debtor's home will relate back to the petition date," perhaps the Debtor could just adjust the arithmetic to pay 27% on the one year of interest that the judgment would have accrued on a pre-petition basis.

Next, as to the Firm's argument that "throughout the good-faith hearing . .

. time and time again . . . Debtor has attempted to manipulate the Bankruptcy Code,

and the Court, in an effort to thwart Hogan Willig . . .", one sees that most of its

citations of testimony, etc., from the "good faith hearing" are echoes of its briefs in the §

522(o) matter. The Firm acknowledges this, and the Court agrees that it is not

inappropriate for the Firm to reargue the same points in the "good faith" context.

In the "good faith" context, the Firm argues that the Debtor's "actions are

strikingly similar" to those of the debtors in *In re Wheeler*, 511 B.R. 240 (Bankr.

N.D.N.Y. 2014) and *In re Caldwell*, 85 F.2d 1123 (6th Cir. 1990), in which the U.S.

Bankruptcy Court for the Northern District of New York and the U.S. Court of Appeals

for the 6th Circuit, respectively, denied confirmation under 11 U.S.C. § 1325(a)(3) and

1325(a)(7) for lack of "good faith." This Court noted above that when the Firm quoted

the eleven-factor "totality of the circumstances" approach enunciated in the *Corino*

case, the Firm chose to emphasize only four of the factors, suggesting that it was

conceding the other seven factors either because they were not applicable in this case

---

The Firm also argues that the Debtor's 27% proposal ignores the fact that by the time the Firm sued the Debtor in state court, it had voluntarily reduced its bill by 37%. The invoice that began the odyssey to the Grievance Committee and the state court and this Court, was more than $127,000 in legal fees. The Firm points that out in the present context because the Debtor must carry the burden of proving the "good faith factor" that requires consideration of "the extent to which secured claims are modified." Again, if the § 522(o) Decision was correct, the Firm does not hold a secured claim. More importantly, however, the fact that the Firm chose to sue the Debtor for 37% less than what she owed it has no relevance to the question of whether she has proven that her plan to pay 27% of the judgment amount is a "good faith" plan.

If this Court's ruling under § 522(o) is reversed on appeal, it is likely that this case will be dismissed and it will be left to state court to decide whether the Firm may foreclose its judgment lien against the Debtor's homestead despite the homestead exemption statute, New York CPLR § 5206.

or because the Debtor had succeeded in this case as to those elements.  Now the Firm

has done the same thing in its "Brief on Burden of Proof" received June 1, 2015, in its

analysis of the *Wheeler* and *Caldwell* cases.  The Court emphasizes its high regard for

the fact that the Firm has provided complete quotations throughout its brief so that

opposing counsel and the Court need not do independent research to determine

whether the cited decisions have been "cherry-picked."  That said, "strikingly similar" is

an overwrought argument.

        As to the *Wheeler* case, the Firm's argument (when using the bold face

words for guidance) is that this Debtor's bankruptcy filing was "precipitated by a ruling

adverse to her in state court" and "a subsequent ruling that held the Debtor in contempt

for failing to comply with the State Court's injunction," and the fact that she then

"attempted to cover it up by her lies and dissembling."  What is included in the Firm's

quotation of the *Wheeler* decision, but not in bold-face, is language making clear that

*Wheeler* had been directed to turn over insurance proceeds which she had wrongfully

converted; that she was held in contempt of court for failure to do so; and that she had

spent more than $80,000 that did not belong to her; and that she then attempted to

cover it up by lies and dissembling.  That is not the kind of case that is presented here.

        As to the *Caldwell* case the Firm provides a very long quotation that it

believes is relevant, but actually involves a debt that had been declared non-

dischargeable.[17]  The court in that case noted first an "unbroken pattern of deceit and

_____

[17]The Firm did not file a 11 U.S.C. § 523 complaint against the present Debtor.

delay," and then stated this: "Our decision rests on much more than the fact that this debt is not dischargeable under Chapter 7; it rests on [that debtor's] <u>unrelenting effort</u> to reduce the assets available to his creditors, <u>to make only minimal payments and over</u> <u>the shortest possible time</u>, and to make even those only when threatened with garnishment. The plan before us was not tendered in good faith, but was one more effort to avoid paying the judgment creditors." [*In re Caldwell*, 895 F.2d 1123, 1127.]

The Court does not find *Caldwell* applicable here.

Finally, the Court addresses what has driven this case from "Day 1," nearly three years ago. In the Firm's submission dated May 29, 2015, and received in the Court on June 1, 2015, the Firm reiterates its position:

[It] is undeniable that the Debtor received thorough and zealous representation by Hogan Willig within her matrimonial matter, as well as her other legal matters being handled by the Firm. The testimony elicited at the good-faith hearing clearly indicates that Debtor was wholly involved with the development of the matrimonial case strategies and was kept fully apprised of the ongoing case status, as well as the status of her outstanding bill. [Over $120,000.] Upon information and belief, if Hogan Willig had been permitted to continue its representation, it is likely that Debtor would have received substantial assets from the divorce and been able to easily pay her outstanding attorney's fees. By way of example, contrary to Debtor's testimony, she did, in fact, receive rent payments for

her Erie Road apartment building based solely upon Hogan Willig's

efforts and representation. . . .   Also contrary to Debtor's testimony, it was

indeed Hogan Willig that finalized and filed the divorce decree.

[Bracket mine.]

On page 10 of the Firm's brief regarding the burden of proof, the Firm

states this:

"In sum, it is clear that Debtor has continuously attempted to use the

Bankruptcy Code to her own personal benefit and to purposefully and vindictively harm

her sole creditor, Hogan Willig.  As such, Debtor has undoubtedly failed to meet her

burden of proving both that her actions in filing for bankruptcy were in good faith and

that the proposed plan itself is in good faith."

## CONCLUSION

The fact that personal bankruptcy is filed to relieve the debtor rather than

her creditor should be obvious to the Firm.  (Although "voluntary" bankruptcy was not

permitted in America until 1841, it was made available then, and Chapter 13 became

available in 1938.)  It cannot be argued to be or viewed to be a lack of "good faith" for a

Chapter 13 Petition to be filed by this Debtor.[18]  The Firm billed her for over $120,000

---

[18]For the benefit of scholars who research such important matters, the Debtor is not a repeat filer; she did not make one agreement in state court and then file here to reject the agreement under § 365, etc. or so on, so to suggest the "tip of the 'false filer' iceberg."

when it knew that she had no means to pay.  The Firm states that she should have

called them for some sort of payment plan for the debt of over $120,000 and that

because of that fact, her filing of a Grievance, and hiring a different matrimonial

counsel, and then looking at bankruptcy with a bankruptcy firm results in a bad-faith

filing if bankruptcy ensues.  It is not.  It is making the best of a bad situation, turn-by-

turn, and employing a privilege given by statute by virtue of Constitutional authority.  If

the Plan itself is "fundamentally fair," then the relevant statutes make it clear that one

may seek relief from even just one onerous debt.

> The Firm does not like that result as to this former client.

> To emphasize its point, the Firm has stated in various ways that this

Court's § 522(o) decision has been a matter of national attention among matrimonial

counsel.  "Might the client who loses confidence in her matrimonial counsel but derives

some benefit from counsel's efforts, put that money into a homestead and then file

Chapter 13 bankruptcy to discharge her debt to the matrimonial lawyer?"

> That is a straw horse that this Court carefully struck down at 508 B.R.

271.

> The Court has considered all other objections raised by the Firm and

rejects them,[19] including the Firm's effort to prove that the Debtor does not live in her

---

[19]As to the dispute about the attorney-client privilege, the Firm's vigorous argument is misplaced.
It argues, essentially, that the Debtor conspired with her current counsel, and with her former son-in-law and
his counsel (the condo she bought as her homestead had been the home of her daughter's fiancé) to commit
a fraud or crime, such that the Hogan Willig firm may subpoena the former son-in-law's real estate lawyer,
and may demand answers from the Debtor, on the witness stand, about her communications with her

condominium.[20]

The 27% Plan proposed by the Debtor, and supported by the Chapter 13 Trustee, will be confirmed.  (The Debtor has steadily made payments to the Trustee. $11,792.00 has been paid to him for prompt distribution in accordance with the 27% Plan.)

Although the standard form of Chapter 13 Confirmation Order in this Court now has to be prepared by the Chapter 13 Trustee and presented to the Court for signature, the Court makes a Rule 54(b) finding that now there is "no just cause for delay" for appeal of this Order, § 522(o) Decision and Order, and all other rulings and orders in this case.  That is because this ruling will bind both the Firm and the Debtor to the terms of the Debtor's Plan, in the absence of reversal.

SO ORDERED.

---

bankruptcy counsel.  There likely are to be cases before the Court in which it might not just grant such a Motion, but rather welcome it.  This is not a case as to which invocation of the fraud/crime exception deserves attention.  As explained above, there was no falsity, deception, or other behavior presented in this case.  Again, this case will turn upon whether  the § 522(o) ruling was correct.  If that ruling is reversed on appeal, the "message" that the Firm wants the Court to send to the debtor-representation Bar will have been sent.  But this Court will not rule that every debtor's lawyer in every case in which he or she zealously represents the client toward availing the client of the privileges that Congress grants in Title 11 of the U.S. Code, may be ordered to (among other dangers) testify against the client if a creditor screams "crime and fraud" loudly enough.  When this writer does apply the exception, it will be in a clear-cut case in which it is clear to the Court that an attorney overstepped the bounds of zealous advocacy, or that he or she was duped by the client.

Appeal as of right now is appropriate, but subject to any different ruling by a Higher Court.

By careful observance of the Federal Rules of Bankruptcy Procedure, the Firm has accomplished the sending of a narrower message - - the Firm does not take lightly a former client's effort to challenge a judgment, in its favor, upon the bill for legal services, even if the challenge has moved to the bankruptcy unit of the District Court for the Western District of New York.

[20]That assertion was rejected by a Bench Order afer another previous hearing.

Dated:      Buffalo, New York
            July 23, 2015


                                                   s/Michael J. Kaplan
                                        _____
                                                      U.S.B.J.